IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **Emmitt Pearson, Jr.,** ) | |
|    **Petitioner,** ) | |
| ) | |
| **v.** ) | **1:21-cv-1270 (RDA/JFA)** |
| ) | |
| **Harold W. Clarke,** ) | |
|    **Respondent.** ) | |

## MEMORANDUM OPINION

Emmitt Pearson, Jr. ("Petitioner"), a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his October 29, 2018, aggravated malicious wounding conviction in the Circuit Court of the City of Newport News, Virginia. Respondent filed a Rule 5 Answer and a Motion to Dismiss with supporting briefs and exhibits. [Dkt. Nos. 13-14]. Petitioner was advised of the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), in accordance with Local Rule 7(K), and he responded by filing a brief in opposition to the motion to dismiss. [Dkt. No. 16]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the Court has determined that Respondent's Motion to Dismiss must be granted, and that the petition must be dismissed with prejudice as a result.

I. Procedural History

The Petitioner is detained pursuant to a judgment of the Circuit Court of the City of Newport News, entered on October 29, 2018, convicting him of aggravated malicious wounding and armed violation of a protective order. Commonwealth v. Pearson, Case Nos. CR17-1831-00 and CR17-1832-00. Petitioner was tried by a jury on May 29-30, 2018, and the jury fixed his

sentence at twenty-five years in prison for the aggravated malicious wounding, and twelve months in prison for the violation of the protective order. (R. 749-50).[1]

Pearson filed a petition for appeal in the Court of Appeals, which a judge of that court denied on July 26, 2019. The denial was adopted by a three-judge panel on November 1, 2019. Pearson v. Commonwealth, Record No. 1760-18-1 (R. 768-79). On appeal, Pearson assigned error to the denial of his motion to strike, which alleged the victim was incredible, (R. 770), and that the trial court erred by not excluding the victim during the trial, (R. 776). The Court of Appeals summarized the evidence as follows:

> Valencia Willis testified that she and appellant had been sporadically involved in a romantic relationship since October 2016. On April 12, 2016, she obtained a protective order against him after he strangled her. The protective order prohibited him from having contact with her and committing acts of violence against her. It was effective until April 10, 2018. Despite the protective order, Willis reconciled with appellant and began living with him. The strangulation charges were *nolle prosequied*. When appellant later threatened her with a gun, Willis admitted that she lied under oath at his bond hearing on the gun charge by stating that the accusation was false, but she stressed that she recanted because she was "scared" of appellant.
>
> On August 11, 2017, Willis spent the day with appellant at his residence. After she left, she called and told appellant that she and her mother were going to a club to dance. While Willis and her mother were at the club, appellant appeared without warning and attempted to join them, but Willis told him that her mother would not "allow it." Appellant continued to drink and watch Willis dance with several men. Willis testified that she had one drink at the club and was not intoxicated while there. While she and her mother left around 11:00 p.m., appellant was still at the club. Willis drove her mother home before returning to appellant's house at approximately 2:00 a.m.
>
> Appellant was not home, so Willis sat outside his house in her car and called him, inquiring where he was. Appellant responded that he was not coming home because he had seen her with other men. Nevertheless, Willis continued to wait for approximately fifteen minutes. Suddenly, appellant "came out of nowhere," "opened [her] car door[,] and started slashing [her]" with a box cutter. Willis grabbed appellant's hand, and he punched her, knocking her out of the car. When

---

[1] The state habeas proceeding includes a copy of the criminal trial record. Unless otherwise indicated, the citations are to the state habeas record. Pearson v. Clarke, Record No. 200982 (Va. Sup. Ct.) ("R. ___").

2

she attempted to wrestle the box cutter from him, appellant bit her. Willis lost consciousness, and upon waking the following day at noon inside appellant's house, her neck was wrapped in bandages. Appellant told her, "You're not going anywhere, you're not going home." Willis, who was very frightened, became more worried when she heard appellant telephone a friend, "Keith," and ask him to come to the house. Convinced that she would be unable to escape after Keith arrived, Willis told appellant that she loved him and wanted to elope with him, but she needed medical treatment before they could leave town. When appellant appeared dubious, she convinced him that she was sincere by having sex with him.

Eventually, appellant allowed Willis to drive to an urgent care center while he followed in his car. When they reached the urgent care center, appellant asked Willis how she intended to explain the wounds on her neck. She told him that she would report that she had been "jumped by some woman." Appellant entered the center with Willis, but after speaking with the receptionist briefly, he stated that he left something in the car and left. Once Willis was alone, she told the receptionist to call 911. The receptionist, who noticed that Willis appeared "very, very scared," notified the authorities. Due to the depth of the wounds, Willis was referred to a local hospital, where the wounds on her throat necessitated a total of eleven sutures. She testified that appellant cut her three to four times. Eight months after the attack, the scars on her throat were plainly visible and ran from beneath her right jaw across the front of her throat. She stated that appellant had written letters to her asking her to forgive him.

Officer Hoxter testified that he responded to the 911 call at the urgent care center. He noted that Willis had a black eye, bite marks on one of her arms near her wrist, and lacerations on the right side of her neck. When Hoxter examined her car, he saw a "reddish substance that appeared to be blood" on the driver's seat as well as the driver's doorjamb. He surmised that the blood had "poured down the right side of the driver's seat ... from the top down," [and] "splash[ed] on[to] the back of the seat ...." Blood was also visible on the underside of the driver's door and in the floorboard. According to Willis, the box cutter was in her car when she drove to the urgent care center, but Hoxter did not see it.² Willis admitted to Hoxter that she was intoxicated when she returned to appellant's house after spending the evening with her mother.

Appellant testified that he injured Willis with a box cutter, but maintained that he was acting in self-defense. Appellant stated that Willis was in his house when he came home on the night of August 12, 2017 and she was intoxicated and belligerent, accusing him of infidelity. He testified that she "g[o]t in [his] face," and "head bumped" him. Appellant also stated that Willis had an eight or ten-inch long knife in her hand. When appellant put his hand on her face to push her away, she bit down on his "pinky" and "ring" fingers. He testified that they struggled and fell onto the bed, but she did not release his ring finger. As they fought, appellant noticed a box cutter on the windowsill. He grabbed it, put it against Willis's throat,

---

² The text of footnote No. 1 in the Order states: "Willis testified that she left the car "open" when she entered the urgent care center with appellant. (R. at 851, n.1).

3

and instructed her to drop the knife. When Willis did not comply, appellant applied more pressure with the box cutter against her neck he stated that he did this "a few times," but Willis did not release his fingers or the knife. Fearing that Willis would "stick [him] in [the] back," appellant "applied pressure the last time," cutting Willis' throat severely. He testified that he realized the severity of her would only after she released him and that he urged her to seek medical assistance immediately. According to appellant, Willis refused because she did not want the medical care provider to know that she had been drinking. Accompanied by appellant, Willis went outside and sat in her car bleeding until the following morning, planning to seek medical attention when she had "sober[ed] up." Appellant denied bandaging Willis's wound.

Appellant presented a photograph of an injury to his left ring finger taken approximately two months after the incident, and testified that it depicted the scar left by Willis's bite. He also stated that Willis had cut his arm with a piece of broken glass approximately one week before the August 12, 2017 incident and that her prior assault was one of the reasons he feared she would stab him with a knife.[3] Appellant admitted that he had several felony convictions.

Antonio Hunter, appellant's life-time friend, testified that he saw Willis at a club in July 2017, and that she told him that appellant was at home. After Hunter and Willis danced together, Willis left the club. When she returned, a towel was wrapped around her hand, and she told Hunter that she had broken appellant's window. Hunter admitted to multiple felony convictions.

On rebuttal, Officer Hoxter testified that he was wearing a body camera when he accompanied appellant to the booking area at the jail on August 12, 2017. Excerpts of the body camera footage depicting discussions between Hoxter and appellant were played for the jury.[4] Appellant told Hoxter that Willis was injured when a woman "jumped her" outside her car and Willis had already sustained the cut to her neck when she returned to appellant's house. He also stated that Willis's wound was not "bad" and that he "put in old dry bandage on it."

(R. 848-53).

---

[3] The text of footnote No. 2 in the Order states: "In support of his testimony, appellant introduced undated photographs of cuts on his right forearm. Although he testified that his girlfriend, Coretta Hill, took the photographs, he did not question her about the photographs during her testimony. Further, Hill did not corroborate appellant's testimony that Willis had cut him. Instead, Hill testified only that Willis broke appellant's window with a crowbar." (R. at 852, n.2).

[4] The text of footnote No. 3 in the Order states: "The recording was not admitted as an exhibit, but excerpts were played for the jury, and the trial court granted the Commonwealth's post-trial motion to make those excerpts part of the record. Therefore, only the following parts of the recording are part of the record: 3:55 to 4:29; 8:19 to 8:45; and 3:11 to 14:05." (R. at 853, n.3).

Pearson filed a petition for appeal in the Supreme Court of Virginia that raised the same two issues denied by the Court of Appeals of Virginia. The Supreme Court of Virginia refused his petition for appeal on November June 22, 2020. <u>Pearson v. Commonwealth</u>, Record No. 191479 (R. 840).

On August 5, 2020, Pearson filed a petition for a writ of habeas corpus in the Supreme Court of Virginia, <u>Pearson v. Clarke</u>, Record No. 200982, in which he raised the following grounds:

A. Pearson alleged that "the police violated his Fifth Amendment right against self-incrimination by initiating a conversation with him about the events underlying the offenses without informing him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and deceiving him into thinking the conversation was confidential and would not be recorded." (R. 872).

B. Pearson alleged that "he was denied the effective assistance of counsel because counsel failed to properly investigate and move to suppress the video recording of petitioner's statements on the grounds that it was obtained in violation of *Miranda*." (R. 872).

C. Pearson alleged that "the trial court violated his due process rights when the judge instructed the jury that the portions of the video recording played at trial were not illegally obtained." (R. 874).

The Supreme Court of Virginia dismissed the habeas petition on May 12, 2021. (R. 875).

Pearson filed his § 2254 petition in this Court on November 4, 2021, and raises the following claims:

1. "Attorney failed to investigate or suppress the Petitioner's statements in Violation of <u>Miranda.</u>" [Dkt. No. 1-1 at 1].

2. "Attorney provided false information about his right to testify. He told the petitioner nothing could be used against him since they did not <u>Mirandize</u> him during his statement." [<u>Id.</u> at 3].

## II. Exhaustion and Procedural Default

"[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest

state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). To satisfy the exhaustion requirement, a petitioner "must have presented to the state court 'both the operative facts and the controlling legal principles.'" Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002) (quoting Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997)).

Exhaustion is a matter of comity to the state courts, and failure to exhaust requires dismissal from federal court so that a petitioner may present his claims to the state courts. See Rose v. Lundy, 455 U.S. 509, 515-19 (1982). Generally, a federal habeas petition containing unexhausted claims will be dismissed without prejudice to allow for further state court review. Id. at 522. If state law, however, would bar further state court review, then federal habeas review of the unexhausted claim is procedurally barred. See Burket v. Angelone, 208 F.3d 172, 183 n.11 (4th Cir. 2000) ("[A] procedural default occurs when the petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'") (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Claim 1 is exhausted because it was raised as Claim B in the state habeas proceeding. Claim 2, however, was not raised during the state habeas proceeding. Even though the merits of Petitioner's federal habeas Claim 2 has not been presented to the Supreme Court of Virginia, his claim is deemed exhausted because it would be defaulted if he presented his claim in a subsequent state habeas petition. Hedrick v. True, 443 F.3d 342, 364 (4th Cir. 2006) (holding that a claim is "technically" exhausted if "a state procedural rule would bar consideration if the claim was later presented to the state court") (citing Gray v. Netherland, 518 U.S. 152, 161-62 (1996)). Thus, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and … prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." Id. at 162. Here,

6

Claim 2 would be barred either under the successive writ statute in Virginia, Va. Code § 8.01-654(B)(2), if it was raised by a petition for a writ of habeas corpus in state court; or by Virginia's statute of limitations for habeas petitions, Va. Code § 8.01-654(A)(2).[5] Claim 2 is therefore simultaneously exhausted and defaulted because Pearson did not raise the claim in state habeas.

### A. Cause and Prejudice

Federal courts may not review defaulted claims absent a showing of cause and prejudice or a fundamental miscarriage of justice, such as actual innocence. Harris v. Reed, 489 U.S. 255, 260 (1989). The existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. See Coleman, 501 U.S. at 753-54; Clozza v. Murray, 913 F.2d 1092, 1104 (4th Cir. 1990); Clanton v. Muncy, 845 F.2d 1238, 1241-42 (4th Cir. 1988). A court need not consider the issue of prejudice in the absence of cause. See Kornahrens v. Evatt, 66 F.3d 1350, 1359 (4th Cir. 1995), cert. denied, 517 U.S. 1171 (1996).

In his reply to the motion to dismiss, Petitioner does not assert any cause for his failure to raise Claim 2 in the state habeas proceedings. Instead, he argues the merits of his claim. Consequently, he has not established cause to excuse his default.

### B. Martinez v. Ryan, 566 U.S. 1 (2012)

Petitioner also does not rely on the "narrow exception" recognized in Martinez, 566 U.S. at 16, as a basis for this Court to review the merits of Claim 2. Martinez held in relevant part that

---

[5] Virginia has a bar on successive habeas petitions; it also has a statute of limitations on habeas petitions. Both statutes constitute "independent and adequate" bases for the procedural default of habeas claims. See Vinson v. True, 436 F.3d 412, 417 (4th Cir. 2005); Mackall v. Angelone, 131 F.3d 442, 446 (4th Cir. 1997) (finding bar on successive habeas applications in Va. Code §8.01-654(B)(2) to be a well-recognized adequate and independent ground); Sparrow v. Dir., Dep't of Corrections, 439 F. Supp. 2d 584, 587 (E. D. Va. 2006) (finding the limitations period of Va. Code §8.01-654(A)(2) to be an adequate and independent ground).

"a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if ... the ineffective-assistance-of-trial-counsel claim is a substantial one." Fowler v. Joyner, 753 F.3d 446, 461 (4th Cir. 2014) (citation and quotation marks omitted). Because his defaulted ineffective assistance of counsel claim is not "substantial" as required by Martinez, he has not met his burden to show cause for the default. See 566 U.S. at 14 (explaining petitioner "must ... demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.") (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

Whether a claim is substantial is measured under familiar principles governing claims of ineffective assistance set forth in Strickland v. Washington. Under Strickland, Petitioner has the burden to show both that his attorney's performance was deficient and that he was prejudiced as a result. See Strickland, 466 U.S. at 687. In Claim 2, Petitioner alleges that his trial counsel was ineffective for providing false information about his right to testify because counsel told him nothing could be used against him since he had not been advised of his Miranda rights prior to his statement. Petitioner alleges that counsel should have advised him that "if you take the stand[,] they will impeach your statement and we lose." [Dkt. No. 1-1 at 3-4]. Absent from his allegations, however, is any assertion that Petitioner told counsel, before he took the stand to testify at his trial, that he was going to testify to facts that were inconsistent with the statements he had made to the officer. See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); see also Langford v. Day, 110 F.3d 1380, 1387 (9th Cir. 1996) (holding that counsel was not ineffective for failing to discover facts that his client knew, but did not tell him); Dooley v. Petsock, 816 F.2d

8

885, 890-91 (3d Cir. 1987) ("A trial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession; clairvoyance is not required of effective trial counsel"); Pressley v. Bennett, 235 F. Supp. 2d 349, 353 (S.D.N.Y. 2003) (if a defendant "did not tell his attorney the truth regarding the … incident, counsel's decision to allow [him] to testify cannot be deemed objectively unreasonable" because "attorneys are not obligated to distrust their clients and conduct independent investigations of their clients' statements before they may reasonably rely on their accuracy"). Further, the only defense Petitioner had was his assertion that he acted in self-defense, which required him to testify because there were no other witnesses present during either Petitioner's or Willis' version of the altercation.

Here, Petitioner's assertion he acted in self-defense rested exclusively on his testimony, which was the predicate justifying the self-defense instructions granted by the trial court. (R. 97-98, 568-69).[6] In preparing for trial, Petitioner's attorney had the right to trust the Petitioner, who

---

[6] In Virginia, "[s]elf-defense excuses or justifies a homicide or assault committed while repelling violence arrayed against the defendant. It is a response to the threat of death or serious bodily harm. It is a defense to an act of violence that repels violence directed at the defendant." Graham v. Commonwealth, 31 Va. App. 662, 672, 525 S.E. 2d 567, 572 (2000). Virginia recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ("justifiable self-defense") and self-defense with fault ("excusable self-defense"). Bell v. Commonwealth, 66 Va. App. 479, 487, 788 S.E.2d 272, 275-76 (2016). Justifiable "self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills [or wounds] another under reasonable apprehension of death or great bodily harm to himself." Id. Excusable self-defense "occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace and kills [or wounds] his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." Id. at 487, 788 S.E.2d at 276 (citations omitted). Self-defense is an affirmative defense in which the "'defendant implicitly admits the killing [or wounding] was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors [and] '[w]hether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact.'" Id. at 486, 788 S.E.2d at 275 (citations omitted).

told him he acted in self-defense, and counsel did not have to "conduct independent investigations of [his] statements before [he could] reasonably rely on their accuracy." Pressley, 235 F. Supp. 2d at 366; see Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995) (holding that "trial counsel … may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation"); Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); see also United States v. Ausmus, 774 F.2d 722, 727 (6th Cir. 1985) ("Professional standards do not require counsel to disbelieve a client and check with other sources unless counsel has a basis for such disbelief."); Gardner v. United States, 680 F.3d 1006, 1010 (7th Cir. 2012) (in context of a charge of illegal possession of a firearm after having been convicted of a felony, a competent lawyer need not "assume" that his clients "lie when they deny possession" of a firearm). Trial counsel was faced with incontrovertible evidence of Willis's severe physical injuries, and without Petitioner's testimony, there would have been no basis for the trial court to have given the self-defense instructions.[7]

The record establishes that counsel was aware of the statements made to the officer, that the statements were made before Petitioner was advised of his Miranda rights, and that the prosecution did not intend to use them substantive evidence at trial. (R. 529-31). To be sure, the

---

[7] To justify an instruction on self-defense, even when the facts are viewed in the light most favorable to the defendant, a defendant must produce more than a scintilla of evidence. Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (citations omitted). Indeed, even a defendant's testimony may not be enough to support granting an instruction on self-defense. For example, in Avent v. Commonwealth, 279 Va. 175, 688 S.E.2d 244 (2010), the Supreme Court of Virginia held that a trial court did not err in denying the defendant's self-defense instruction because "[u]nder either account of the events given by [the defendant]—his trial testimony or his statements made to investigators—he forfeited his right to a self-defense jury instruction because he was not without fault in bringing on the difficulty that resulted in [the victim's] death, and he was not in reasonable fear of death or great bodily harm when he killed [the victim]." Id. at 202-03, 688 S.E.2d at 259.

prosecutor sought to admit the prior inconsistent statements solely for the purpose of impeachment, which was not possible until after the Petitioner testified. (Id. 530). In addition, contrary to Petitioner's assertion that counsel did not investigate, counsel did review the tape prior to trial and concluded the statements were not a "threat" to the Petitioner's defense because there was no "confession," (Id. 539, 544), which would have been inconsistent with the self-defense case that he had been preparing.[8] The prior statements to the officer had no evidentiary value for the prosecution until *after* the Petitioner testified, inconsistently, on several points.

In addition, while trial counsel admitted he did not anticipate that any portion of the tape would be admitted, out of the five portions of the video the prosecutor sought to sue, defense counsel successfully argued against the admission of two video clips, and had a third video clip limited to only a portion of what the prosecutor had sought to be admitted. The trial judge only allowed three discreet portions of the tape to be played to the jury: the Petitioner's "adding details" to the story that the victim was "jumped" to include that she was jumped in "Park Place" while she was urinating, which he had omitted from his testimony, (3:55 to 4:19); testifying that he did not have sex with the victim, which he had admitted to in his statement to the officer, (8:19 to 8:45); and testifying that he bandaged the victim's wounds, which he had admitted to the officer, (13:11 to 14:05), (R. 542-43).

First, there is no evidence that counsel was unaware of the rule allowing a defendant to be impeached with statements that had been made without being advised of his Miranda rights. Indeed, defense counsel's arguments at trial indicate that he was aware of the rule. Moreover, the

---

[8] Counsel successfully had prior acts evidence introduced at trial, via his testimony as well as Hill and Turner's, in support of the self-defense element that Petitioner had a reasonable fear of imminent danger of bodily harm. (Id. 466-68, 470, 476-77, 479-80, 500-03, 518). Counsel used Hill and Turner's testimony not only in support of his claim of self-defense, but they also corroborated parts of the Petitioner's testimony.

11

prosecutor's arguments confirm defense counsel's conclusion that she had not intended to use the prior statements as substantive evidence and that it was only *after* the Petitioner testified that she believed the prior statements had evidentiary value as impeachment evidence. (R. 529-31). Petitioner also does not allege that he ever told his counsel he was going to testify in a manner that was inconsistent with his prior to statements to the officer. Defense counsel, however, was aware that Petitioner would be impeached when he testified because he had numerous prior felony convictions and sought to minimize that impeachment evidence by bring it out on direct examination.[9]

Petitioner had a right to testify in his own defense, Rock v. Arkansas, 483 U.S. 44, 49(1987), but that right was "'not unlimited'" and "the right to testify clearly does not include the right to commit perjury." United States v. Midgett, 342 F.3d 321, 325 (4th Cir. 2003) (quoting United States v. Teague, 953 F.2d 1525, 1530 (11th Cir. 1992) (en banc) and citing Nix v. Whiteside, 475 U.S. 157 (1986)). Moreover, the Petitioner has not alleged that he told counsel that he would testify inconsistently with his prior statement before he testified. See Jackson v. Scully, 781 F.2d 291, 297 (2d Cir. 1986) (petitioner not denied effective assistance when trial counsel failed to object to alleged Fourth Amendment violation not based upon counsel's alleged unfamiliarity with Fourth Amendment doctrine, but instead from petitioner's failure to inform counsel of the circumstances surrounding the allegedly improper arrest); cf. Clanton v. Bair, 826 F.2d 1354, 1356-58 (4th Cir.1987) (trial counsel not ineffective in failing to pursue mitigation evidence through a psychiatric examination where defendant would not consent and counsel had no reason to suspect the defendant had been abused as a child). Trial counsel had no reason to

---

[9] Petitioner admitted that he was a convicted felon with multiple robbery convictions, an armed burglary conviction, and a felony drug conviction (R. at 495-96).

assume that the Petitioner would testify inconsistently with his prior statement, which counsel reviewed during his investigation of the case prior to trial. See Emmett v. Kelly, 474 F.3d 154, 168 (4th Cir. 2007) (holding competent defense counsel need not "presume that his client ... is being deliberately misleading" because otherwise counsel would be in "an impossible position" of being "unable to trust the word of the client ...."); United States v. Pitcher, 7 F. App'x 119, 120-21 (2d Cir. 2001) (noting that "[a]ny deficiency in counsel's advice ... [may be] properly attributable to [the client's] own dishonesty in dealing with his lawyer"); Tyson v. Keane, 159 F.3d 732, 736 (2d Cir. 1998) (rejecting an ineffective assistance claim where the "principal reason" counsel pursued the "'wrong' defense strategy" was the defendant's "own conduct, whether characterized charitably as lack of candor or as a lie"). The Petitioner's assertion that counsel was deficient by not advising the Petitioner about the potential for impeachment, without Petitioner having informed counsel of the fact that he intended testify inconsistently with his prior statement to the officer, has no merit.

Even assuming that counsel was deficient, which the record does not establish, the Petitioner has not established prejudice. Petitioner argues he would not have testified if he had been advised that he could have been impeached. Petitioner argues he was prejudiced because "[t]he only way that recording would have been beneficial [to the prosecution] in any [was] through the petitioner['s] own testimony which [the prosecutor] would have never had" if he had been properly advised by counsel. [Dkt. No. 16 at 5]. If the Petitioner had not testified, however, there would have been no evidence to support his claim of self-defense.[10]  Under such circumstances, Petitioner cannot show that there is a "reasonable probability that, but for counsel's

---

[10] As noted by the Supreme Court of Virginia in state habeas, even if counsel had filed a motion to suppress and the body camera video had been suppressed, the prior inconsistent statements would have been admissible for impeachment purposes. (R. 874).

13

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Petitioner has not established a claim of ineffective assistance of counsel under either prong of Strickland v. Washington, much less a substantial claim as required by Martinez.

### III. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, 556 U.S. 111, 121 (2009). "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 20 (2013).

An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Renico v. Lett, 559 U.S. 766, 772-73 (2010). That is, the state court's judgment "must be objectively unreasonable, not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (internal quotations and citation omitted); see Harrington v. Richter, 562 U.S. 86, 103 (2011) (state decision is unreasonable application of federal law only if ruling so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement").

This "highly deferential standard ... demands that state court decisions be given the benefit of the doubt." Renico, 559 U.S. at 773 (internal quotations and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." Lenz v.

14

Washington, 444 F.3d 295, 299 (4th Cir. 2006). "[A] determination on a factual issue made by a State court shall be presumed correct." Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." Green v. Johnson, 515 F.3d 290, 299 (4th Cir. 2008); see Schriro, 550 U.S. at 473-74. AEDPA also limits federal habeas "review under § 2254(d)(1) … to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).[11]

Claims of ineffective assistance of counsel are determined based on the highly demanding standard set forth for such claims in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, the Petitioner has the burden to show both that his attorney's performance was deficient and that he was prejudiced as a result. See Strickland, 466 U.S. at 687.

A "doubly deferential judicial review" applies to "a Strickland claim evaluated under the § 2254(d)(1) standard." Knowles, 556 U.S. at 123; see also Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016). Put another way, federal courts on habeas review give the benefit of the doubt to the state courts and to defense counsel. Woods, 136 S. Ct. at 1151. "Section 2254(d) codifies the

---

[11] Pinholster explained that

> [w]hat makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed. We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge.

563 U.S. at 183 n.3; see Muhammad v. Clarke, 2012 U.S. Dist. LEXIS 10129, *24 (E.D. Va. Ja. 26, 2012) (where a petitioner attempts to allege unexhausted facts, the federal court must defer to the state court's finding) (citing Kasi, 300 F.3d at 501-02; Pinholster, 563 U.S. at 182-83), appeal dismissed, 474 F. App'x 979 (4th Cir. 2012). Pinholster emphasized "that the record under review is limited to the record in existence at that same time — *i.e., the record before the state court*." Id. (emphasis added).

15

view that habeas corpus is 'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Valentino, 972 F.3d at 581 (quoting Harrington, 562 U.S. at 102-03) (additional citation omitted).

Strickland's first prong, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. A federal court reviewing a habeas petition indulges a "strong presumption" that counsel's conduct fell within the "wide range of reasonable professional assistance." Id. at 689. The "basic lesson" of Strickland is that "judicial scrutiny" of counsel's performance must be "highly deferential." United States v. Mason, 774 F.3d 824, 828 (4th Cir. 2014) (citation omitted). Attorneys "are permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success." Id.

Strickland's second prong, the "prejudice" inquiry, requires showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Valentino, 972 F.3d at 580 (quoting Harrington, 562 U.S. at 86); accord Shinn v. Kayer, 141 S. Ct. 517, 523 (2020). The question is whether the state court, which has "substantial 'latitude to reasonably determine that a defendant has not [shown] prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." Mays v. Hines, 141 S. Ct. 1145, 1149 (2021) (quoting Knowles, 556 U.S. at 123).

The two-pronged Strickland test also applies to claims of ineffective appellate counsel. Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc). An ineffective counsel claim may be

16

disposed of on either prong of the Strickland test. See Jones v. Clarke, 783 F.3d 987, 991-92 (4th Cir. 2015); Spencer v. Murray, 18 F.3d 229, 232-33 (4th Cir. 1994).

In Claim 1, Petitioner alleges that his "trial counsel was ineffective for failing to investigate and to move to suppress his statements to the police." This claim was raised in state habeas as state habeas Claim (B) and the Supreme Court of Virginia found that it did not satisfy either the "performance" or the "prejudice" prong of the two-part test enunciated in Strickland v. Washington, holding that:

> [t]he record, including the trial transcripts, demonstrates petitioner slashed the neck of the victim, V.W., with a boxcutter, bit her arms, and punched her face. V.W. testified the incident occurred in her car outside petitioner's home after the two had seen each other at a club. V.W. "passed out" and awoke the next day inside petitioner's home with her neck bandaged. Worried she remained in danger, V.W. told petitioner she loved him and wanted to elope, but that she needed medical treatment before they could leave town. She also testified about having sex with petitioner to convince him of her sincerity. Eventually petitioner allowed V.W. to drive to an urgent care center for medical treatment, and petitioner followed in his car. At the urgent care center, petitioner asked V.W. how she would explain the wounds on her neck. V.W. said she would report being "jumped by some woman." Petitioner entered the care center with V.W., but, when he stepped outside, V.W. asked the receptionist to call 911.
>
> Testifying at trial, petitioner asserted he acted in self-defense because V.W. was the aggressor. He acknowledged he had not previously told the police he was defending himself but, rather, had repeated V.W.'s story that she had been "jumped." He also denied bandaging V.W.'s wounds and denied having sex with her before going to the urgent care center.
>
> To impeach petitioner's testimony, the Commonwealth called Officer Adam Hoxter as a rebuttal witness. Hoxter responded to the 911 call and arrested petitioner. Hoxter testified he spoke about the incident with petitioner during booking and that the conversation was recorded on his body camera. Hoxter acknowledged the recording violated jail policy, but he explained that "[s]ometimes [he] forget[s]" about the policy and his camera remains "on" during booking. Hoxter neither warned petitioner about the recording nor informed him of his Miranda rights.
>
> The Commonwealth sought to play various portions of the recording for the jury. Petitioner's counsel objected "in the strongest possible terms." Counsel argued the Commonwealth's tactic was a "surprise," that the statements were obtained without proper Miranda warnings, and that the statements did not actually impeach petitioner's testimony. As the court reviewed the recording, petitioner's counsel

17

> revealed he did not spend much time reviewing the recording because the statements "were unwarned," contained no confession, and, therefore, counsel "didn't think any of this would come in." Over petitioner's objections, the court allowed three portions of the recording to be played at trial for impeachment purposes because they were inconsistent with petitioner's testimony at trial.
>
> Although counsel admittedly did not review the details of petitioner's recorded statements because he believed they were obtained in violation of Miranda and therefore inadmissible, petitioner has not explained how this alleged shortcoming affected the outcome of the trial. A motion to suppress the statements on the basis of the Miranda violation, even if successful in rendering them inadmissible in the Commonwealth's case-in-chief, would not have precluded admissibility at trial for purpose of impeachment. See Mincey v. Arizona, 437 U.S. 385, 397-98 (1978) (defendant's voluntary statements, even when made "in circumstances violating the strictures of Miranda v. Arizona, are admissible for impeachment"); see also Harris v. New York, 401 U.S. 222, 226 (1971) ("The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."). In any event, counsel objected to the Commonwealth's use of petitioner's statements to rebut petitioner's trial testimony on the very basis he alleges counsel should have relied. Moreover, petitioner has failed to proffer what information counsel would have discovered from further investigation of the recording or how that information would have resulted in a more robust defense such that the outcome of the proceedings would have been different. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(R. 873-74). The Supreme Court of Virginia's dismissal of this claim was not an unreasonable application of clearly established federal law nor was it an unreasonable determination of the facts presented at trial. Claim 1 will be dismissed.

IV. Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss, [Dkt. No. 13], will be GRANTED. An appropriate Order and judgment shall issue.[12]

Entered this 12 day of October 2022.

Alexandria, Virginia

/s/
Rossie D. Alston, Jr.
United States District Judge

---

[12] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.